Grier Estate

Before Klein, P. J., Bolger, Saylor and Shoyer, JJ.

*John Harper* and *William H. S. Wells,* of *Saul, Ewing, Remick & Saul,* for exceptants.

*H. Clayton Louderbach,* of *Obermayer, Rebmann, Maxwell & Hippel; William P. Thorn, Frank O.*

*Schilpp,* of *Rambo & Mair; Joseph N. DuBarry, 4th,* and *John S. Estery,* of *Montgomery, McCracken, Walker & Rhoads; Albert C. Weymann, Jr., Edwin O. Lewis* and *A. J. Drexel Paul, Jr.,* of *Norris, Lex, Hart & Ross; Paul Van Reed Miller, Seth W. Watson, Jr., William C. Ferguson, Jr., B. I. De Young, Samuel W. Morris* and *Arthur Littleton,* of *Morgan, Lewis & Bockius; Philip A. Bregy, Eric A. McCouch* and *Paul Maloney,* contra.

KLEIN, P. J., May 20, 1960.—Jay R. Grier died June 13, 1958, in his eighty-eighth year. He had been a lawyer since 1891 and specialized in probate matters for many years. He had never married and when he died his closest next of kin were three first cousins.

The balance of his personal estate, after payment of debts, administration expenses and $66,500 on account of Pennsylvania transfer inheritance tax was $574,-580.25. Decedent owned one piece of real estate, 5134 Newhall Street, Philadelphia, valued at $6,000.

The will was typed by testator personally on two sheets of paper, in very close, single space. Testator instructed his executors, after payment of his debts and funeral expenses:

"*Item One* . . .

"To make sale of any and all personal property, such as household goods, for the best price or prices obtainable therefor, and after all debts, inheritance taxes and the like have been fully paid, *to distribute the residue to and among the following named persons and/or corporations, as hereinafter bequeathed, that is to say:* (Italics supplied)

"To *Emma G. Oldknow,* the sum of Ten thousand dollars, ($10,000) free of all inheritance taxes of every kind or description, absolutely.

"To *Laura Sand,* the sum of One hundred dollars ($100) free of all taxes; . . ."

These directions are followed by 25 gifts, two for $2,000 each to two of his three surviving first cousins and the remaining 23 to charitable organizations. Each of these gifts is followed by the words "free of all taxes and absolutely."

Testator then did a most unusual thing. He left a blank space of about two and three-quarters inches in his tightly typed will between the end of the list of legacies in *item 1* and the beginning of *item 2*. Sometime after the date upon which he executed his will, he added the twenty-eighth legacy in this blank space, a second gift to Miss Sand, to whom he had previously given $100. This addition is in a lighter type and indented. It reads:

"To *Miss Laura Sand*, of 5321 Wayne Svenue (sic), Germantown, Philadelphia, the sum of *Two hundred and fifty dollars ($250)*, free of taxes and absolutely in appreciation of her many kind acts from time to time."

The blank space still remained at about two and a quarter inches when the will was probated.

*Item 2* of the will provides, as follows:

"*Item 2*—I authorize and direct my executors hereinafter named, or their successors, to make sale of the realestate known as No. 5134 Newhall Street, Germantown, Philadelphia 44 for the best price obtainable therefor, and to make, execute and deliver their deed of conveyance for the same to the purchaser thereof in fee simple, clear of all encumbrance and to distribute the proceeds to and among the legatees as hereinefore (sic) named."

The total of the pecuniary legacies listed in *item one* is $125,450, of which $14,350 is bequeathed to the named individuals and $111,100 to the charities. This disposed of only about 20 percent of the personal estate.

The next of kin, the three surviving first cousins, contend that there is an intestacy as to the residue.

The charities and the other individual legatees maintain that Mr. Grier has disposed of his entire estate. The auditing judge agreed with the latter position and rules that testator disposed of his entire residuary estate among his legatees in proportion to their legacies.

The next of kin have filed exceptions, which are now before us for consideration.

We regret that we cannot agree with the conclusions of the learned auditing judge. In our opinion, testator has failed completely to dispose of the balance of his personal estate, after payment of the 28 designated pecuniary legacies, and that an intestacy results with respect to this balance.

As compelling as the commandments of our sacred Decalogue, is the basic rule in probate courts that the pole star in interpreting a will is testator's intention: Sarver's Estate, 324 Pa. 349 (1936); Britt Estate, 369 Pa. 450 (1952); Weaver Estate, 390 Pa. 128 (1957). Each will is unique and for this reason precedents are of little value: Brennan's Estate, 324 Pa. 410 (1936); Jackson's Estate, 337 Pa. 561 (1940). The slightest variation in language and *attending circumstances* may lead to wholly different conclusions with regard to testator's intent, and therefore to wholly different results: Byrne's Estate, 320 Pa. 513, 523 (1935).

In our opinion, the circumstances of the present case are most unusual. Ordinarily, a will is started and brought to an end in a continuous and unbroken recital of instructions and directions pertaining to the disposition of testator's property following his death. This is not the case with respect to the will before us. Testator deliberately left a space of more than two inches at the end of *item one*, in the very heart of the dispositive portion of the instrument. The auditing

judge has failed completely to give consideration to this unique feature of this will.

There is no magic in the use of the word "residue". An effective residuary gift can be made without using the word "residue" and its use does not, of itself, constitute a residuary clause. Where testator manifests an intent to dispose of everything not otherwise disposed of by the will, the dispositive clause is regarded as residuary; no technical mode of expression is necessary: Armstrong Estate, 347 Pa. 23 (1943). See also Haak's Estate, 342 Pa. 93 (1941); Slater Estate, 377 Pa. 285 (1954); Carson's Estate, 130 Pa. Superior Ct. 133 (1938).

In the present case, although testator used the word "residue", it seems evident that he failed to dispose of his entire estate. He apparently left the blank space of over two inches at the end of the paragraph in order that he might add, at a later time, the name of one or more beneficiaries who would receive the balance of the personal estate after the payments of debts, taxes and the other pecuniary legacies. This is the only logical explanation of this void. This aged man either wholly forgot to complete his will or died before he made up his mind with finality.

Except where the provisions of the will direct otherwise, or the intention of testator to the contrary can be plainly inferred therefrom, collateral or succession taxes are chargable against, and payable out of, the respective legacies bequeathed by the will: Brown's Estate, 208 Pa. 161, 164 (1904). The residue of an estate bears the burden of all taxes on legacies which testator has exempted from payment of tax. Each of the 28 pecuniary legacies in *item one* is made clearly and unmistakably "free of tax". It is wholly inconsistent and incompatible with an intention to dispose of the residue of the estate to specify that the residuary legacies be free of all taxes.

Testator, who was an experienced lawyer and learned in probate law, must have been aware of this. The only reasonable conclusion from this circumstance is that he intended to give each legatee the designated gift, undiminished by the imposition of tax, and no more. If he meant to give the residue to these pecuniary legatees, the use of the language making these legacies free from tax was meaningless and surplusage. We cannot attribute such an intent to this lawyer-testator. The effect of the adjudication is to hold that "free of tax" really means "subject to tax" and to make the charitable legacies subject to a pro rata share of the Federal estate tax upon the legacies to the individuals, from which they would normally be exempt. This is a tortured and illogical conclusion which we must reject. Furthermore, the adjudication attempts to change the dollar mark attached to each pecuniary legacy into a fractional share of the general residue. There is nothing in the will authorizing such a change.

We cannot accept the contention that testator's use of the words "to distribute the residue to and among the following named persons and/or corporations as hereinafter bequeathed" supports the conclusion of the adjudication that testator intended a proportional distribution of the general residue. On the contrary, we believe the language to mean that each of the named legatees is to receive the designated amount of the legacy but no more than this.

Furthermore, we cannot accept the legatees' contention that the provisions of *item 2* are sufficient to indicate that testator intended to dispose of his entire personal estate in *item 1*. All that this paragraph directs is that the proceeds of the sale of a single piece of real estate be divided among the named legatees. It does not state in what proportions the distribution is to be made. Not one word is contained in this item

which directly or indirectly throws any light on the manner in which the balance of the personal estate remaining after the payment of the pecuniary legacies is to be distributed. Neither in *item 1*, nor in *item 2*, does testator make any disposition of the balance in question. When zero is added to zero, the total is still zero. *Item 1* and *item 2*, whether read singly or together, fail to prevent an intestacy of the balance of the personal estate.

Under the circumstances of the present case, we need not concern ourselves with the off-setting presumptions that a testator intends to dispose of his whole estate and the equally important presumption that an heir is not to be disinherited except by plain words or necessary implication. See Bigony Estate, 397 Pa. 102 (1959). It seems evident that testator did not intend to benefit his next of kin beyond the two legacies of $2,000 each given to his cousins, Martha G. Michael and Georgia B. Michael. It is just as likely that he did not intend to have any part of his estate pass under the intestate laws. What he intended, in our opinion, was to fill in the blank space at the end of *item 1* by inserting the name of an individual or a charity to receive the balance of his personal estate not bequeathed in the enumerated list. That at least one, and possibly three, insertions were made after the will was executed, is evident from an examination of this will. However, it is clear that testator failed to add the final gift which would have effected a complete disposition of his personal estate and prevented the occurrence of an intestacy. The manner in which testator intended to dispose of the balance is a matter for speculation and conjecture in which we are not permitted to indulge.

The Supreme Court's statement in Schmidth Estate, 183 Pa. 641 (1898), at page 647, is most pertinent:

"The omission of a residuary clause in wills is not by any means an uncommon occurrence. But because of such omission it is neither necessary nor proper to give the residue to some specific legatee upon a forced construction of words which do not indicate such a purpose in the mind of the testator."

We are convinced that even if Mr. Grier had not made each of the legacies for specific amounts and free of all taxes and if, further, he had not left the blank space in his will, the legatees would still not be entitled to the balance they are claiming.

Several cases have been before our courts in recent years, in each of which the language used was much more indicative of an intention to dispose of the entire residue, yet in each case the court reached a contrary result.

In Bigony Estate, supra, testatrix directed:

"Second. All the rest, residue and remainder of my estate, consisting of securities, stocks, bonds and mortgages, I give and bequeath unto my said Sister . . ."

Three years after her death, certain assets were found, consisting of the balance of a trust fund set up under her husband's will and the proceeds from the sale of real estate set apart as her intestate allowance in her husband's estate. The question was raised as to whether the language of the will constituted a general residuary clause, effectively disposing of these after-discovered assets, or whether she died intestate with respect thereto. The Supreme Court held that this language showed an intent to limit the property passing thereunder to the assets known to testatrix, i.e., securities, stocks, bonds and mortgages.

We believe the decision in Heintzleman Estate, 66 D. & C. 543, which was before our court in 1949, to be most persuasive. In that case, testator provided:

"6. I give, devise and bequeath the rest, residue and remainder of my estate real personal and mixed of every character and nature whatsoever as follows. . . ."

Testator then listed six pecuniary legacies which did not exhaust the residue of his estate. As in the present case, the legatees claimed the balance in proportion to their respective legacies. What Judge Hunter said at page 544, in denying their claims, can be repeated here with profit:

"There is nothing in the language of the will which indicates that the amounts of these legacies are to be so increased, and the court cannot insert a substantive disposition of property which testator himself failed to make. The rights conferred by the intestate laws are only taken away by a will which effectually disposes of the entire estate of decedent; and, while a construction is not to be adopted if it can be avoided which will lead to an intestacy, interpretation is never to assume the proportions of reformation. The question is confined to the meaning of what testator has said, and does not extend to the consideration of what he might have said but did not: De Silver's Estate, 142 Pa. 74 . . ."

Wilt Estate, 9 Fiduc. Rep. 334 (1959), is also very much in point. In that case, testatrix provided:

"Item 2. When everything is disposed of, my half estate shall be divided into three shares, as follows: One share for Malta Home of Granville, Pa.; One share to Odd Fellows Home of Middletown, Pa.; and the third share to Christ Lutheran Church of Allentown, Pa."

In Item 3, testatrix provided:

"Of the other half of my estate, I give and bequeath unto Mrs. Alben Eckhard, the sum of $1,500.00 dollars."

In Items 4, 5, 6 and 7 testatrix gave pecuniary gifts to legatees in stated amounts, the total of which was $7,716.75 less than half of the estate. Judge Gearhart held that item 2 operated as a residuary clause as to one-half of the estate but that there was a partial

intestacy as to the balance of the other half. He said, at page 336:

"It is to be observed that the testatrix in Item 2 made an outright gift of the half of her estate. In Item 3 she did not make a gift outright of the half of the estate. What the testatrix did was to refer to the half of her estate and out of it she carved pecuniary bequests in stated amounts to named individuals. No where did she make any disposition or refer to the balance remaining after the payment of the pecuniary legacies. We have here a situation where a portion of the estate is 'undisposed of.' *But it is not a devise or bequest which is undisposed of.* Testatrix probably, by inadvertence, failed to add a residuary clause, disposing of the balance, or she may have thought that the pecuniary bequests would consume the half of the estate. Whatever the reason for her failure to insert a residuary clause disposing of this balance, must become a matter of conjecture on our part. This we are not permitted to indulge in."

To the same effect see Corr's Estate, 202 Pa. 391 (1902) ; and Sowden Trust, 6 Fiduc. Rep. 619 (1956), in which the present auditing judge reached a different result.

We therefore conclude that Jay R. Grier, testator, failed to dispose of that portion of his personal estate in excess of the 28 pecuniary legacies set forth in *item 1* of his will and that an intestacy occurred with respect thereto.

The exceptions are therefore sustained and the adjudication, as modified in the opinion, confirmed absolutely.

SHOYER, J., dissenting, May 20, 1960.—It is inconceivable to me that an experienced lawyer, admittedly a specialist in the preparation of wills and the administration of decedents' estates, would, in making his own testamentary provision for immediate distribu-

tion and no future estates, fail to dispose of his residue. Furthermore, the majority opinion finds him guilty of corrupting a word of art, viz., "residue", and that in the disposition of his own property. For the reasons given in my adjudication I believe that he has adequately expressed in *writing* his intent to bequeath his *entire* estate, and therefore I dissent.

## Parkhurst Estate (No. 2)

762

Before Klein, P. J., Bolger, Lefever, Saylor and Shoyer, JJ.

The facts appear from the following opinion of

KLEIN, P. J., November 10, 1959.—Wilbert P. Parkhurst died a resident of Puerto Rico, on June 28, 1958. When he died, Girard Trust Corn Exchange Bank, hereinafter referred to as Girard, held, in a safekeeping account in his name, various securities listed in the joint names of decedent and each of the five following persons: His son, Charles Parkhurst; his daughter, Elsie Parkhurst; his niece, Rae Fischer, and two employes, Cristina Rivera and Socorro Rivera.

Norman Parkhurst was appointed judicial administrator of decedent's estate in Puerto Rico. On February 25, 1958, a citation issued upon the judicial administrator's petition, directed to Girard and the five above designated persons, to show cause why decedent's checking account and the securities registered jointly in their names and the name of decedent in decedent's safekeeping account, should not be released to him. Preliminary objections were filed by Girard, challenging the jurisdiction of the orphans' court. In an opinion by Lefever, J., dated May 28, 1958, reported in 14 D. & C. 2d 661, the preliminary objections were sustained without prejudice to the right of any proper person to apply for ancillary letters of administration and to raise the questions raised in the petition at the audit of the ancillary administrator's account.

Ancillary letters of administration were issued by the Register of Wills of Philadelphia County to Seymour C. Wagner on July 21, 1958. On March 30, 1959, a citation issued on his petition, directed to Girard and to the aforementioned five persons, to show cause why the moneys contained in decedent's checking account and the jointly registered securities should not be released to the ancillary administrator.

An answer was filed by Girard, which, in effect, states that it is a stakeholder and will abide by the decision of the court, which it regards as necessary to protect it from double liability, because of the conflicting claims of the parties in interest.

Stipulations in lieu of answers were filed by Elsie Parkhurst, Cristina Rivera and Socorro Rivera agreeing that the cash and the jointly registered securities could be transmitted to the domiciliary administrator without prejudice to their rights to make such claims as might be appropriate at the domicile.

Responsive answers were filed by Charles W. Parkhurst and Rae Fischer, and replies were filed thereto. These matters came on for hearing before me on October 13, 1959.

Rae Fischer, decedent's niece, is a resident of Pennsylvania and receives no benefits from decedent's estate in Puerto Rico. In sustaining the preliminary objections filed in this case, Judge Lefever said, on page 667:

". . . Rae Fischer is entitled to have the question of her title to these certificates determined in Pennsylvania and not be required to undergo the expense and effort of following these certificates to Puerto Rico. . . ."

We are in full accord with this statement. In Noble Estate, 71 D. & C. 183 (1950), we said, at page 188:

"The law is clear that the orphans' court, when adjudicating the account of an ancillary administra-

tor, is not restricted to making awards to creditors only. It may, in its discretion, distribute the funds among the parties entitled to it or remit it to the forum of the domicil for that purpose: Bertin's Estate, 245 Pa. 256 (1914); Dent's Appeal, 22 Pa. 514, 520 (1854)."

Accordingly, we will pass upon Rae Fischer's claim to the securities and the dividends declared thereon in this opinion.

We will, however, refrain from passing upon the claim of decedent's son, Charles. He is a resident of Puerto Rico and is entitled to a share of his father's estate. It appears from statements of counsel that under the law of Puerto Rico all property received by a beneficiary from a decedent in his lifetime or placed in their joint names by decedent is treated as an advancement. Such property is regarded as part of decedent's estate and then deducted from the heir's share. I accordingly direct that the securities held jointly by decedent and his son, Charles, be transmitted to the domiciliary administrator without prejudice to Charles' right to make such claims thereto as he deems appropriate at the domicile in Puerto Rico.

The facts with respect to Rae Fischer's claim are not in dispute, having been agreed to in a stipulation of counsel which has been made part of the record.

Decedent opened a checking account in his own name in 1937 at Corn Exchange National Bank and Trust Company, hereinafter referred to as Corn Exchange, now, by merger, Girard Trust Corn Exchange Bank. On the date of decedent's death, $14,892.36 was on deposit in this account.

On or about September 15, 1941, decedent, with his own funds, purchased the following securities, and caused them to be registered in his name and that of his niece, Rae Fischer, "as joint tenants with the rights of survivorship and not as tenants in common":

50 shares General Motors Corporation, common stock, par $10, certificate no. W C 401-852; 10 shares E. I. du Pont de Nemours & Co., 4½ percent preferred, certificate no. J-66837; and 40 shares Commonwealth Edison Co., certificate no. 61655.

The certificates were forwarded by the bank to decedent on October 22, 1941. On October 6, 1942, decedent rented a safe deposit box at Corn Exchange. One week later, on October 13, 1942, he changed it into a jointly owned box in his name and that of Rae Fischer, "with either having full rights of entry therein without the presence of the other."

The safe deposit box was surrendered on September 4, 1947, and Rae Fischer delivered the above listed securities to the Corn Exchange "for account of W. P. Parkhurst—safe keeping."

The 40 shares of Commonwealth Edison Co. were sold by Corn Exchange on decedent's written order on November 20, 1950, for $1,073.47, and the 10 shares of du Pont preferred were sold on his written order on November 22, 1950, for $1,243.82.

On February 1, 1951, Corn Exchange purchased 50 shares United States Steel common and charged decedent's account with the cost. The certificate was registered in the joint names of decedent and Rae Fischer in the same manner as the stock which had been sold. The certificate was placed in decedent's safekeeping account. In 1955, this stock was split two-for-one and a new certificate issued, registered jointly in the same manner. This certificate was also delivered to Corn Exchange for safekeeping on behalf of decedent.

As a result of two stock splits of the General Motors stock, the first, a two-for-one split on October 30, 1950, and the second, a three-for-one split in 1955, three new certificates for 100 shares each were issued, each registered jointly in the names of decedent and Rae Fischer.

These certificates were also retained by the bank in decedent's safekeeping account.

All dividends issued on all of these shares in decedent's lifetime were deposited by the bank to the credit of the "W. P. Parkhurst" checking account.

- All of the stock certificates in question held in decedent's safekeeping account were accompanied by what were described in the stipulation as "printed forms of 'loose powers' or 'stock powers' or 'assignments separate from certificate,' all undated and all blank as to type of security, certificate number, name of transferee or assignee, and in all other respects also blank, except that each bore the signature of decedent and Mrs. Fischer."

The custodian department cards of Corn Exchange or Girard with respect to all of the securities mentioned in the preceding paragraph were titled in the name of W. P. Parkhurst and no other name appears on the account card as an owner or coöwner of the account and, as a matter of this bank's practice, none of the securities would have been delivered to anyone other than decedent except upon decedent's express authorization.

The auditing judge is of opinion that the present case is controlled by Martella Estate, 390 Pa. 255 (1957), and Grossman Estate, 386 Pa. 647 (1956).

In the Martella case certain stock certificates in the name of decedent and one of his sons "as joint tenants with right of survivorship and not as tenants in common" were found in a small metal box which decedent always kept in his possession in his house and to which he had access but the son did not. All of the stocks in question were purchased by decedent with his own money and all of the income from the stocks was kept by decedent and included in his income tax returns. In holding that no valid inter vivos gift had been proved, Mr. Justice Bell said, at page 258:

"In Grossman Estate, 386 Pa. 647, 126 A. 2d 468, the Court said (pages 649-650) : 'In Brightbill v. Boeshore, 385 Pa. 69, 122 A. 2d 38, the Court, quoting Tomayko v. Carson, 368 Pa. 379, 383, 83 A. 2d 907, said (page 74) : " 'A claim of a gift inter vivos against the estate of the dead must be supported by clear and convincing evidence: Leadenham's Estate, 289 Pa. 216, 137 A. 247; Snyderwine, Admrx. v. McGrath, 343 Pa. 245, 22 A. 2d 644.' "

" 'In the recent case of King Estate, 387 Pa. 119, 126 A. 2d 463, . . . the Court said (page 122) : "To constitute a valid gift inter vivos . . . , two essential elements are requisite: An intention to make an immediate gift and such an actual or constructive delivery to the donee (a) as to divest the donor of all dominion and control, or (b) if a joint tenancy is created, as to invest in the donee so much dominion and control of the subject matter of the gift as is consonant with a joint ownership or interest therein." ' " See also Balfour v. Seitz, 392 Pa. 300 (1958) ; Elliott Estate, 378 Pa. 495 (1954).

It seems evident that Rae Fischer has failed to meet the burden which is placed upon her to establish that decedent made a completed inter vivos gift of the stock in dispute to her.

In the opinion of the hearing judge decedent did not intend to make an immediate gift of the jointly registered securities to claimant; evidently they were not to become her property until he died. Decedent retained sole and complete control and dominion over them during his lifetime. He could do with them as he willed without interference from his niece. Although the securities were registered in their joint names, they were in decedent's sole possession at the time of his death. There was no delivery to claimant which vested in her the degree of control over the securities that is consistent with joint ownership or interest in the

securities, and the execution and delivery by her to decedent of the blank stock powers permitted him to deal with the stock as if he were the sole owner.

Counsel for Rae Fischer appears to place great reliance upon the fact that for a period of five years from October 13, 1942, until September 4, 1947, the original securities, registered in their joint names, were kept in a safe deposit box to which each had full access. In our opinion this fact is of little consequence under the circumstances of this case.

In Grossman Estate, supra, a stock certificate, made out in the name of decedent or his sister, was found in his safe deposit box after his death. A printed power of attorney, signed by claimant, was attached to the certificate, authorizing decedent to pledge the certificate as collateral security for any loan. It also appeared that claimant had a right of access to the box. The court held that these facts were not sufficient to constitute clear and convincing evidence of a valid inter vivos gift of a joint interest in the stock certificate with right of survivorship. The court said, at page 650:

"Assuming Theodore Grossman had a donative intent, claimant failed to prove an actual or constructive delivery of the stock of Hudson's, Inc., by clear and convincing evidence. Claimant, we repeat, never had possession of the stock certificate; the stock certificate was always kept in the safe deposit box of decedent. *A right of access* to the safe deposit box which contained these shares, as well as *many other shares* of stock of the decedent, does not amount to or prove delivery or a completed gift to claimant. Even a joint lease of a safe deposit box, without more, is not of itself sufficient to establish joint ownership of securities found therein which originally belonged to one of the lessees: Tomayko v. Carson, 368 Pa. supra; Wohleber's Estate, 320 Pa. 83, 181 A. 479; Cf. also King Estate,

387 Pa., supra [387 Pa. 119]; Isherwood v. Springs-First National Bank, 365 Pa. 225, 74 A. 2d 89."

In the instant case, Rae Fischer surrendered any right she may have had in 1947, when she removed the securities from the joint safe deposit box and returned them to decedent's sole and exclusive control. She did not at any time include any of the securities as her property in her Pennsylvania personal property returns. Her entire course of conduct negatives' her present claim and clearly demonstrates that she did not regard herself as a coöwner of the securities but merely as her uncle's agent to facilitate his dealings with them.

We are confirmed in our conclusion by the significant fact that the specific securities Rae Fischer is now claiming were never in the safe deposit box. The United States Steel stock was purchased in 1951, about four years after the box was surrendered, and the certificate for 50 shares of the General Motors stock originally in the box was returned and replaced by three new certificates for 100 shares each.

The hearing judge therefore rules that Wilbert P. Parkhurst, decedent, did not make a valid gift inter vivos of the securities registered in his name jointly with his niece, Rae Fischer, and that consequently she had no right or title thereto.

Rae Fischer's claim with respect to the dividends received prior to decedent's death is also without merit. Decedent acted, and was consistently treated, as the sole owner of these dividends during his lifetime. They were all credited at his express direction to his sole account and he included all of them in his Federal income tax returns. Decedent's appropriation of these dividends was never challenged or questioned by claimant. She never received or claimed any of the dividends in her uncle's lifetime and there is nothing in this record to suggest that she expected, or that her uncle

intended her, to have any right to or interest in them while he was living. This is fully supported by her admission that she never included any of the dividends in her income tax returns.

The claim with respect to the dividends declared on the securities since decedent's death is equally without merit. Having concluded that Rae Fischer has no right or title to the securities themselves, it follows without question that she has no right of any kind to these dividends.

Accordingly the claims of Rae Fischer to the securities registered jointly in the names of decedent and herself, as well as to all dividends declared in his lifetime or since his death, are dismissed. . . .

*Joseph N. Dubarry, 4th,* of *Montgomery, Mc-Cracken, Walker & Rhoads,* for exceptants.

*Alan Reeve Hunt* and *William White, Jr.,* of *Duane, Morris & Heckscher,* contra.

BOLGER, J., June 3, 1960.—As recited in the opinion of the hearing judge, decedent, a resident of Puerto Rico, maintained a safekeeping account at the Girard Trust Corn Exchange Bank, and at the time of his death certain securities were found in this account registered severally but similarly in the joint names of decedent and of five other persons. The hearing judge passed upon the merits of only one of these claims, viz., that of Rae Fischer, decedent's niece. Of the four others, upon whose claims the hearing judge did not take jurisdiction but reserved to all of them the right to present their claims against decedent's estate at his domicile, Puerto Rico, only one, decedent's son, Charles, has filed exceptions. The niece, Rae Fischer, also filed exceptions, which are the main subject of this opinion.

Since our jurisdiction over the claim of the son, Charles, was discretionary with the hearing judge and the record does not reveal that the refusal to assume jurisdiction was capricious or arbitrary, we find the